## Ford et al. v. Consolidated Grocery Company.

## Same v. Call Brothers Hardware Company.

## Same v. Pikeville Grocery Company.

(Decided May 17, 1929.)

HARMAN, FRANCIS & HOBSON and JULIUS R. SAMUELS for appellants.

CHILDERS, AUXIER, BOWLES & AUXIER for appellees.

Opinion of the Court by Judge Dietzman—Reversing.

About the year 1914, the Ford Elkhorn Mining Company, a corporation of which the appellant B. N. Ford was the president and principal stockholder, leased a small tract of land on Robinson creek in Pike county, which it proceeded to develop as a coal mine, building miners' houses, buying equipment, erecting and maintaining a commissary and doing all those things usually done in the development of a coal mine lease. It was not successful, and was later thrown into bankruptcy. Its assets were bought at the bankruptcy sale by George A. Clutts who resold them to B. N. Ford. The latter thereupon organized the appellant Ford Elkhorn Coal Company, a corporation in which he was also the president and principal stockholder, and to which he transferred the assets of the old Ford Elkhorn Mining Company, which he had bought from Clutts. The Ford Elkhorn Coal Company then operated this mine until January, 1927. In the preceding December, Mr. Clutts, who was the resident manager of the mine, resigned. Mr. Ford lived at Cincinnati, where he was engaged in the business of selling coal, not only for the Ford Elkhorn Coal Company, but also for others. As he could not take over the active management of production of the Ford Elkhorn Coal Company, he at once began a search for a new superintendent and manager. He met his friend, Mr. Ben Tate, also a resident of Cincinnati, who was interested in the United Collieries Company, a corporation also engaged in the sale of coal for various coal companies. Mr. Ford was not connected in any way with the United Collieries Company, nor was Mr. Tate connected in any way with the Ford Elkhorn Coal Company or with the Universal Coal Company of which we shall presently speak, except in one particular to be presently mentioned. Mr. Ford informed Mr. Tate of his troubles.

It so happened that at this time A. G. Richardson, whom Mr. Tate knew, had recently been to see Mr. Tate to find out if Mr. Tate knew of a coal mine which he might lease for purposes of operation. Mr. Tate, then having a good opinion of Mr. Richardson, suggested his name to Mr. Ford who at once got in touch with him. Without going into the details of the negotiations between Ford and Richardson, suffice it to say that Richardson did not want to go to work as a salaried employee of the Ford Elkhorn Coal Company. He wished, if the enterprise were succesfsul, to have a share in the management and profits of the enterprise. So he and Mr. Ford entered into a contract whereby they agreed that a new corporation to be known as the Universal Coal Company, with a capital stock of 100 shares of no par value, should be organized; Ford and Richardson to take 50 shares each of such stock. Ford agreed that as soon as this company should be organized he would procure the Ford Elkhorn Coal Company to lease to the new company all of its equipment and its leaseholds for a period of three years with privilege of extensions, and to sell it its commissary supplies at specified prices. The new company was to pay to the Ford Elkhorn Coal Company for the lease a royalty of 20 cents per ton on the coal mined, out of which the Ford Elkhorn Coal Company was to pay the royalties due the landowners, averaging about $8\frac{1}{4}$ cents per ton; to pay all taxes on the property, and to keep it fully insured. The new company was also to constitute Mr. Ford's sales company and the United Collieries Company, its exclusive agents to sell its output for the usual commission paid by coal companies for such service.

It was also agreed that the new company should pay Richardson $300 a month for his services as manager and Ford the sum of $300 per month for his services as president and accountant for the concern, but Ford's salary was not to be actually paid him until it had been earned by the company. The stock was to be paid for at the rate of $10 per share. Pursuant to this contract the Universal Coal Company was organized under the laws of the state of Ohio, Ford purchasing 47 shares, two of his secretaries one share each, and his attorney one share. However, Ford paid with his own check for the whole 50 shares. Richardson also gave a check for his 50 shares, but it turned out to be no good, and this $500 was charged against his salary account on the books. After the Uni-

versal Coal Company was organized, the Ford Elkhorn Coal Company sent to it a written proposition embodying the terms of the lease and sale of commissary supplies as had been agreed upon in the Ford-Richardson contract. The Universal Coal Company accepted this written proposition, but no formal lease was ever executed by the parties. The Ford Elkhorn Coal Company turned over to the Universal Coal Company the mines, the equipment and the commissary supplies, making an inventory of all of these things at the time. The Universal Coal Company, however, never paid the Ford Elkhorn Coal Company for the commissary supplies thus bought as it never had any funds it could devote to that purpose. Richardson entered upon the management of the mine in January, 1927. Although the Ford Elkhorn Coal Company while it was running the mine had a daily output of from three to four cars a day, yet, after Richardson took charge for the Universal Coal Company, the output fell to not exceeding two cars per day and ofttimes to one car per day. 90 per cent. of this output was sold at prevailing market prices through Tate's company in which Ford had no interest.

The record strongly indicates a total lack of proper management of the mine on the part of Richardson, and the losses began to pile up. The Universal Coal Company was never able to pay the Ford Elkhorn Coal Company the agreed royalties, and Mr. Ford had to advance out of his own pocket close on to $10,000 to meet pay rolls and other pressing bills of the Universal Coal Company. Ford never drew any of his salary. He was continually pressing Richardson for a more economical management of the company, which Richardson seemed unable to accomplish. Finally in the latter part of July, 1927, Ford came to the conclusion that he could no longer finance the company, and after parleying with Richardson he proposed to the latter that the Universal Coal Company surrender its lease to the Ford Elkhorn Coal Company, turn back what commissary supplies it had to the latter company in part payment of the debt due from the Universal Coal Company to the Ford Elkhorn Coal Company, and then "die a natural death." At that time the Universal Coal Company was indebted to the various parties, among whom were the three appellees, for merchandise sold it by them. Richardson, while this parleying was going on, claimed that he was under a legal obli-

514

gation to pay some of the debts of the Universal Coal Company by reason of a guaranty he had given to such creditors, and that these debts amounted to $1,400. He insisted that Ford pay him the $1,400 so that he could discharge this indebtedness. Ford declined to do this, but did finally agree that, if Richardson would transfer to him his stock, he would pay Richardson $100 in cash and would also pay any obligations of the Universal Coal Company for which Richardson was legally bound by any guaranty not exceeding $600 in amount, but which amount was to be credited by the value of some ponies belonging to the Ford Elkhorn Coal Company and turned over by it to the Universal Coal Company, and which had been sold by Richardson, Ford claiming that Richardson had pocketed the proceeds, and Richardson claiming that he had used them for the company. The $600 was also to be credited by the sum of $159.60 which Richardson had drawn out from the commissary store and claimed to have paid to a collector for the Big Sandy Electric Company in discharge of a bill due that company. Richardson had taken no receipt for this bill, and did not give the name of the collector in his testimony. The appellant's proof tended to show first there was no such bill, and secondly, no such payment. The $600 was further to be credited by whatever Richardson owed the commissary and by an amount due the commissary from one Williams, and which Richardson by agreement with Williams had assumed, thus paying a debt he individually owed Williams. The net result of these credits was that the amount of debts which Ford thus agreed to pay did not exceed $75.

Proper steps were then taken by the stockholders of the Universal Coal Company to surrender the leasehold to the Ford Elkhorn Coal Company. Ford paid to Richardson the $100 he had agreed to do, and Richardson turned over to him his stock. The Universal Coal Company then became moribund. Thereafter three separate suits were brought, one by appellee Pikeville Grocery Company, another by the appellee Consolidated Grocery Company and the third by the Call Brothers Hardware Company. The Pikeville Grocery Company and the Call Brothers Hardware Company made the Universal Coal Company, the Ford Elkhorn Coal Company, B. N. Ford, and A. G. Richardson parties defendant, but the Consolidated Grocery Company sued only the Universal Coal

Company and the Ford Elkhorn Coal Company. Each of the plaintiffs by their suits sought a recovery against the Universal Coal Company for the merchandise sold and delivered to it by them. The Pikeville Grocery Company and the Call Brothers Hardware Company by their suits also sought to fasten liability for the claims they had against the Universal Coal Company upon Ford, Richardson, and the Elkhorn Coal Company on the theory that the Universal Coal Company was only a dummy corporation "conceived in fraud and brought forth in iniquity," devised and gotten up to shield its codefendants from having to pay for the credit they were going to get through their dummy, and organized solely for the purpose of cheating and defrauding those who would extend credit to their dummy. They also sought to set aside the transfer of the assets of the Universal Coal Company to the Ford Elkhorn Coal Company and to have it declared a preference operating as an assignment for the benefit of creditors. See Kentucky Statutes, sec. 1910. The Consolidated Grocery Company sought no judgment against Ford or Richardson, but did, by its suit, seek to fasten liability on the Ford Elkhorn Coal Company for the claim it had against the Universal Coal Company on the theory that the Universal Coal Company had sold its assets in bulk to the Ford Elkhorn Coal Company without any compliance by either of these parties with the provisions of our sales in Bulk Statute. Kentucky Statutes, sec. 2651a1 et seq.

Neither Richardson nor the Universal Coal Company made any defense to these suits. Indeed, Richardson became a witness for the plaintiffs, now appellees, and did all he could to assist them in the prosecution of these suits. Ford and the Ford Elkhorn Coal Company filed their answers in all three suits. In those of the Pikeville Grocery Company and the Call Bros. Hardware Company they denied the fraud alleged in the petition, and averred that the organization of the Universal Coal Company was bona fide. They did admit that the transfer to the Ford Elkhorn Coal Company of the lease and the commissary supplies by the Universal Coal Company could not be upheld in view of the Bulk Sales Law and section 1910 of the Statutes, and offered to surrender these assets into court for the purpose of sale and division of the proceeds among the creditors of the Universal Coal Company.

516

So far as the Consolidated Grocery Company case was concerned, the answer of the Ford Elkhorn Coal Company was simply an offer to turn the assets it had received from the Universal Coal Company into court for a sale and division of the proceeds among the creditors of the Universal Coal Company. Further pleadings made up the issues as thus indicated. After proof had been taken the court, after filing a written opinion, gave judgment in favor of each of the plaintiffs, now appellees, and against the Universal Coal Company, the Ford Elkhorn Coal Company, B. N. Ford, and A. G. Richardson, for the debts sued for based on the theory of the fraud advanced by the Pikeville Grocery Company and the Call Bros. Hardware Company hereinbefore set out. From those judgments these appeals are prosecuted by Ford and the Ford Elkhorn Coal Company only.

In so far as the appeal from the judgment in favor of the Call Brothers Hardware Company is concerned, it will have to be dismissed. The judgment of this appellee is only for the sum of $184.82, and this court has no jurisdiction of an appeal from a judgment in such an amount.

We are informed in the briefs of counsel that these cases were consolidated in the lower court and heard together. Although we have been unable to find any such order in the record, we may concede this to be so, and yet that would not give this court jurisdiction of the appeal from the judgment of the Call Bros. Hardware Company. The claims of these appellees were separate and distinct from each other, and although tried together, the judgments in the three cases could not be added together for the purpose of giving this court jurisdiction. It was so expressly held in the case of Wallins Creek Collieries Co. v. Marshall, 217 Ky. 647, 290 S. W. 519, and on the authority of that case the appeal from the judgment in favor of the Call Bros. Hardware Company is dismissed.

So far as the appeal from the judgment of $926.15 in favor of the Consolidated Grocery Company is concerned, it will have to be reversed. This appellee asked no judgment against Ford or Richardson, and indeed did not make either of them parties to its suit. Its judgment against Ford, then, is clearly unwarranted. So far as its judgment against the Ford Elkhorn Coal Company is concerned, it too is erroneous. The Consolidated Grocery Company sought judgment against the Ford Elk-

horn Coal Company only in accordance with the provisions of the Bulk Sales Law, and that law provides for a liability on the part of a purchaser of merchandise in bulk, in the event he does not comply with the provisions of that law about giving creditors of the seller notice, etc. (see Kentucky Statutes, sec. 2651a1 et seq.) only to the extent of "the fair value of all the property so bought or sold." Kentucky Statutes, sec. 2651a3. There is no evidence in this record as to what the lease which appellants by their answer are willing to be here included in such assets as come within the purview of the provisions of the Bulk Sales Law, and which was surrendered by the Universal Coal Company, was worth, although the record tends to show that it was valueless. The evidence does show, however, that the supplies which the Universal Coal Company turned back to the Ford Elkhorn Coal Company were worth not more than $175 on the market. The court should have required the Ford Elkhorn Coal Company to pay into court for the benefit of the creditors of the Universal Coal Company this sum of $175. It is true that the record discloses that the mining equipment on the property was worth probably some $2,500, but the Universal Coal Company never had any title to this equipment, but only a lease upon it. The court should also have fixed a value, if any, upon the lease which appellants conceded should go for the benefit of the creditors of the Universal Coal Company and have required the Ford Elkhorn Coal Company to pay this value into court for the benefit of such creditors. On the return of this case, the court may, if the parties so desire, hear additional proof in order to arrive at the value of this lease. We are unable to fix any such value in the present state of the record.

Coming now to the judgment of $545.75 in favor of the Pikeville Grocery Company, we find ourselves unable to agree with the finding of facts of the chancellor. We need not stop to inquire as to the soundness of the legal theory upon which the Pikeville Grocery Company founds its claim against Ford and the Ford Elkhorn Coal Company based upon its allegations of fraud. We may concede, solely for the purpose of this case, that its theory is sound. But the evidence does not sustain its claim. We fail to find any fraud in the organization of the Universal Coal Company. It is plain that this coal company was organized because of Richardson's demand for

a share in the management and profits of the undertaking. Both he and Ford then thought that the company was going to be a profitable enterprise, and probably it would have been had Richardson proved to be the competent manager he was thought to be. There was nothing in the preliminary agreement entered into by Ford and Richardson at all different from the usual course taken by people who propose to organize a corporation. The stock of the Universal Coal Company was owned about equally by Richardson and Ford. Its control was vested between these two, if it be conceded Ford could control his secretaries and lawyer in this connection. Neither of these state of facts existed with reference to the Ford Elkhorn Coal Company. They were plainly different entities. The Universal Coal Company was organized to meet Richardson's demands. There was, so far as this record shows, no idea of defrauding anybody on the part of Richardson or Ford in the organization of this new company. Although the capital stock of the Universal Coal Company was small, yet this fact was not a concealed one, but fully open to discovery by any creditor who proposed to sell the new company goods. Ford himself lost a large sum of money in the operation of the Universal Coal Company. His letters to Richardson indicate earnest efforts on his part to make this company a success. He continually impressed upon Richardson the need of economy and the curtailment of purchases. He was ever urging Richardson to a larger output. His efforts were fruitless. What output there was, was sold almost entirely by Tate's company. So Ford did not even get any incidental profit arising out of commissions earned for the sale of the coal. He never drew any salary. No rent was ever paid the Ford Elkhorn Coal Company. The record clearly paints a picture of frustrated hopes rather than any scheme or conspiracy to defraud.

We can find no claim in the pleadings, although we do in the brief of the appellee, that the judgment should be rested upon Ford's promise to pay the debts which Richardson had guaranteed to the extent hereinbefore set out. But, even if the pleadings did contain such a claim, the Pikeville Grocery Company does not show that it was one of the creditors, the payment of whose debt Richardson had legally guaranteed, and indeed the amount of its claim is far beyond the amount which Ford

agreed to pay all the creditors whose claims Richardson said he had guaranteed.

What we have said in connection with the appeal from the judgment in favor of the Consolidated Grocery Company applies to any judgment in favor of the Pikeville Grocery Company that can be rested on the provisions of the Bulk Sales Law, or on those of Kentucky Statutes, sec. 1910 et seq., especially so far as the latter statute is concerned; since the status of a surrender of the leasehold into court cannot be had now as of the time when it should have been made.

The appeal from the judgment in favor of the Call Bros. Hardware Company is dismissed.

The appeals from the judgment in favor of the Pikeville Grocery Company and the Consolidated Grocery Company are reversed, with instructions to dismiss their petitions against the appellant Ford and to enter a judgment requiring the Ford Elkhorn Coal Company to pay into court for the benefit of all the creditors of the Universal Coal Company who prove up their claims, as provided by law, the sum of $175 and such further sum as the court may determine to be the value of the leasehold surrendered by the Universal Coal Company at the time of its surrender to the Ford Elkhorn Coal Company.